IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DANIEL BARTHOLOMEW CLARK #194417, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:17-cv-429-ECM-WC |
| | ) | [wo] |
| | ) | |
| PATRICIA HOOD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.    INTRODUCTION[1]

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Daniel Bartholomew Clark, a state inmate, in which he challenges conditions present during his prior term of incarceration at the Draper or Staton Correctional Facility in Elmore, Alabama.   Specifically, Clark alleges that the defendants conspired against him by disciplining him for fighting without a weapon as a "cover-up" for an assault by other inmates which served as a basis for a separate lawsuit filed by the plaintiff and which was dismissed with prejudice by this court on August 18, 2019.  See, *Clark v. Daniels, et al.,* 2:16-cv-403-WHA-WC (M.D. Ala.).  In the instant action, he further alleges that he was subject to "cruel and inhuman treatment" when he was locked in restricted housing for 30 days.  Lastly, he alleges deliberate indifference to a serious medical condition while being

---

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk in the docketing process.

held in restricted custody from May 16, 2016 through June 7, 2016.  (Doc. 1 at pp. 2–3).

Clark names as defendants Patricia Hood, Warden; Jarmal Sewell, Correctional Lieutenant;

Issac Coach, Correctional Officer; and Ronzella Howard, Correctional Captain.  Clark

seeks monetary damages for the alleged violations of his constitutional rights.  (Doc. 1 at

pp. 2 and 4.)

The defendants filed special reports and relevant evidentiary materials in support of

their reports, including affidavits and certified copies of Clark's medical records,

addressing the claims raised in the complaint.  In these documents, the defendants maintain

they did not act with deliberate indifference to Clark's medical needs.  They further state

that they did not conspire against the plaintiff by covering-up the assault against him and

they did not subject him to "cruel and inhuman treatment".  (Docs. 11 and 16).

After reviewing the special reports filed by the defendants, the court issued an order

on November 27, 2017, directing Clark to file a response to each of the arguments set forth

by the defendants in their reports, supported by affidavits or statements made under penalty

of perjury and other evidentiary materials.  (Doc. 17 at pp. 1-2).  The order specifically

cautioned that "**unless within ten (10) days from the date of this order a party . . .**

**presents sufficient legal cause why such action should not be undertaken** . . . the court

may at any time [after expiration of the time for the plaintiff filing a response to this order]

and **without further notice to the parties** (1) treat the special reports and any supporting

evidentiary materials as a motion for summary judgment and (2) after considering any

response as allowed by this order, rule on the motion for summary judgment in accordance

with the law."  (Doc. 17 at p. 2).  Clark filed a sworn response to this order on February

27, 2018.  (Doc. 25).  Pursuant to the directives of the order entered on November 27, 2017, the court now treats the defendants' report as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II.    FACTS

The court takes judicial notice of the underlying facts in *Clark v. Daniels, et. al,* 2:16-CV-403-WHA-WC, (Doc. 76 at pp. 3–5) which are pertinent to this action.    These facts are restated herein as follows:

On May 9, 2016 about 4:45pm, Clark was discovered by Correctional Lieutenant Jarmal Sewell lying on the floor in Dorm D with injuries to his head and facial area.  About 5:10 p.m. on May 9, he was seen in the Health Care Unit for treatment.  (Doc. 51-1 at p. 2).  Dr. Herring examined Clark and found him "unresponsive and identified significant head trauma with bilateral hematomas (collection of blood) over and around his eyes." (Doc. 55-1 at ¶7).  Dr. Herring ordered Clark to be transported via ambulance to Jackson Hospital emergency room for treatment.  *Id*.  Clark left Staton for Jackson Hospital by ambulance about 5:25 p.m.  He was treated at Jackson and returned the Staton about 10:30 p.m. on May 9.  Upon his return, he was examined by a nurse at Staton and it was noted that he was awake and his vital signs were stable.  (Doc. 55-1 at ¶ 10).  He was assigned to bed number 17 in the medical observation unit and the correctional staff placed a hold on Mr. Clark for his personal safety following the altercation.  *Id.*   Clark was checked by the nursing staff at least three times during the night of May 9.  (Doc. 55-1 at ¶11).

On May 10, 2016, Dr. Herring entered an order for Clark to receive acetaminophen codeine at 300 mg twice a day for three (3) days and ibuprofen (Motrin) at 400 mg three (3) times a day for seven (7) days.  (Doc. 55-1 at ¶12).  On May 11, 2016, he was examined by a nurse and it was noted that his face and eyes were still swollen.  (Doc. 55-1 at ¶12).  On May 13, 2016, Clark's condition had "improved significantly" and he was moved to a holding cell off a hallway in the Staton health care unit.  (Doc. 55-1 at ¶15).  On May 14, 2016, he was examined by a nurse and he was found to be "calm and cooperative".  He was "alert and oriented and his breathing was even and unlabored".  (Doc. 55-1 at ¶16).  On May 16, 2016, Clark was transferred from Staton to Draper.  Prior to his transport, a Staton nurse performed a body chart on Clark.  It was noted that Clark had "multiple healing abrasions with scabs on his back and shoulder.  There was swelling and bruising around both of his eyes . . . and scabs in his nasal area."  (Doc. 55-1 at ¶17).

An investigation of the May 9, 2016 incident concluded that Clark, who was under the influence of a narcotic, approached several inmates and threatened to beat them if they said anything to him. Clark approached inmate Goodwin and swung at him with his right hand. Clark and Goodwin started fighting and inmate Young also joined in the fight against Clark. (Doc. 51-1 at p. 2).

Additional relevant facts are stated as follows: Following the altercation between the plaintiff and the other inmates, the plaintiff was disciplined for fighting without a weapon. On May 9, 2016, during the investigation, the plaintiff admitted to Defendant Lt. Sewell, the arresting officer, in the presence of Defendant Captain Howard that he was fighting with inmates Anthony Young and Marcellus Goodwin. (Docs. 11-4 at p.2 and 11-4 at p. 5). The plaintiff was given notice of the charges against him and his right to present evidence and question witnesses. (Doc. 11-4 at pp. 1–2). A hearing was held on May 27, 2017 (Doc. 11-4 at p. 2), where the plaintiff was found guilty of fighting without a weapon. (Doc. 11-4 at pp. 1–11).

Defendant Officer Isaac Coach served as the hearing officer for the disciplinary proceedings where the plaintiff was found guilty of the offense based on evidence presented during the hearing. He denies that he was prejudiced towards anyone involved in this incident or that he participated in any conspiracy against the plaintiff. (Doc. 11-3). Specifically, it was determined after the investigation into the incident that all three inmates were fighting without a weapon. Additionally, the arresting officer testified that the plaintiff admitted to fighting two other inmates without a weapon. Each inmate received a disciplinary for his actions. (Doc. 11-4 at pp. 1–9).

Following the plaintiff's transfer to Draper on May 16, 2016, Correctional Sergeant Robert Parker placed the plaintiff in Draper's Disciplinary Dormitory on May 18, 2016.

4

(Doc. 11-1). Warden Hood did not give anyone instructions to place the plaintiff in Draper's Disciplinary Dormitory. *Id.* However, on May 31, 2016, Warden Hood approved a disciplinary against the plaintiff for violation of rule #501-Fighting without a weapon. *Id.* The sanctions imposed included 30 days in disciplinary segregation. *Id.* The plaintiff was released from Draper Disciplinary Dormitory on June 16, 2016 for time served. *Id.* The plaintiff claims that he was denied necessary medical treatment during the time that the plaintiff was housed in the disciplinary dormitory at Draper. (Doc. 1 at p. 3).

## III.   DISCUSSION[2]

### A.   Absolute Immunity

To the extent Clark lodges claims against the correctional defendants in their official capacities and seeks monetary damages, these defendants are entitled to absolute immunity. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). As the Eleventh Circuit has held:

> the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]. There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute. Waiver may not be implied. *Id.* Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

---

[2] The court limits its review to the allegations set forth in the complaint, as amended. (Docs. 1, 30). *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Sec'y, Fla. Dept. of Corr.*, 502 F. App'x. 905, 909–10 (11th Cir. 2012) (holding that plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted).  Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here. The Alabama Constitution states
> that "the State of Alabama shall never be made a defendant in any court of
> law or equity." Ala. Const. Art. I, § 14.  The Supreme Court has recognized
> that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir.1990)).  In light of the foregoing, defendant Jarmal Sewell, and any other defendants whom Clark seeks to sue in their official capacities, are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Comty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

### B.    Deliberate Indifference Generally

The law is well-settled that establishment of both objective and subjective elements are necessary to demonstrate a violation of the protections afforded by the Eighth Amendment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty. Ala.,* 268 F.3d 1014 at 1028–29 (11th Cir. 2001) *abrogated on other grounds by Bell Atl. Corp v. Twombly,* 550 U.S. 544 (2007). As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 837–38 (1994); *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments

Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). . . . Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . .  Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]."  *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).  Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference."  *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted).  Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983."  *Id*.

### C.    Deliberate Indifference to Medical Needs.

Clark alleges that the defendants acted with deliberate indifference to his medical needs when they denied him adequate medical treatment during the time period beginning May 16, 2016 through June 7, 2016, while he was housed in Draper Disciplinary Dormitory

(Doc. 1 at p. 3). His medical ailments resulted from an altercation with two other inmates which occurred on May 9, 2016, while the plaintiff was housed at Staton. *Id.* The court has previously considered the plaintiff's medical indifference claim for this time period and beyond, albeit as it pertained to different named defendants. *See Clark v. Daniels, et al.,* 2:16-cv-403-WHA-WC (August 18, 2019 M.D Ala.). Thus, the Court will take judicial notice of the relevant facts from this prior action which pertain to the time period at issue in the instant action. After careful review, the court concludes that these assertions entitle Clark to no relief.

### 1. <u>Standard of Review.</u>

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate

indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248,1255 (11th Cir. 1999) (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).  To proceed on a claim challenging the constitutionality of medical care, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment."  *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986).

In addition, "to show the required subjective intent . . . , a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things[:] awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an

10

excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.  When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent."  *Massey v. Montgomery Cty. Det. Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)].  Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers,* 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference).  Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  "[A]s *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment."  *Adams*, 61 F.3d at 1545 (citation and internal quotation marks).  To show deliberate indifference, the plaintiff must demonstrate a serious medical need and then must establish that the defendant's response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (citation and internal quotation marks omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (holding that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient); *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference."); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a

serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm.").

### 2.  Analysis

Clark asserts that from May 16, 2016, through June 7, 2016, while he was housed in Draper Disciplinary Dormitory, the defendants denied him adequate medical treatment for injuries received in an altercation with fellow inmates which occurred on May 9, 2016, while he was housed at Staton.  (Doc. 1 at p. 3).  Defendants adamantly deny they acted with deliberate indifference to Clark's medical needs during the time relevant to this complaint.

In accordance with an order of this court, the defendants in the instant action submitted medical records relevant to this time period.  (Doc. 16-1 at pp. 1-45).  The court also takes judicial notice of the affidavit of Dr. Ronald Herring, who was the Medical Director at Staton from July 22, 2015, until September 6, 2016, and reviewed the pertinent medical records and testified by affidavit in *Clark v. Daniels, et al.,* 2:16-cv-403-WHA-WC (M.D Ala. August 18, 2019).  The portions of his affidavit relevant to the plaintiff's claims for medical indifference occurring from May 16, 2016, until June 7, 2016, and arising from the May 9, 2016, altercation are set out below.

> The ADOC transferred Mr. Clark from Staton to Draper on May 16, 2016.  (COR 052).  At the request of the correctional staff, a member of the Staton nursing staff performed a body chart on Mr. Clark on May 16, 2016.  (COR 021).  The nurse examined Mr. Clark and noted multiple healing abrasions with scabs on his back and shoulder.  (COR 021).  There was swelling and bruising around both of his eyes, and the nurse noted scabs in his nasal area.  (COR 021).
>
> .   .   .

A member of the nursing staff saw Mr. Clark on June 1, 2016, after he expressed concerns of back discomfort. (COR 047-048). The nurse examined Mr. Clark and found that his hand grips were strong, his posture was erect and his gait was symmetrical. (COR 048). Mr. Clark was alert and oriented at that time, and the nurse found no indications that he required emergent or urgent intervention. (COR 048-049).

On June 1, 2016, I prescribed ibuprofen at 200 mg for Mr. Clark to take twice a day for seven (7) days for any discomfort. (COR 005). A nurse practitioner on the Staton medical staff renewed the ibuprofen prescription on June 6, 2016 and prescribed 200 mg twice a day for seven (7) days through June 14, 2016. (COR 006).

On June 2, 2016, Mr. Clark submitted a sick call request expressing concerns about dizziness and an inability to keep his balance and voicing concern that May 9, 2016, altercation aggravated a concussion he suffered at Decatur Work Release in March of 2016. (COR 037).

A member of the nursing staff saw Mr. Clark at sick call on June 3, 2016, when he complained of dizziness, headaches, difficulty keeping his balance and seeing floaters. (COR 050). During the nurse's examination, Mr. Clark indicated that these symptoms started as far back as March 9, 2016. (COR 050). During the examination on June 3, 2016, the nurse completed a Glasgow Coma Scale to determine if Mr. Clark might be suffering from an impairment in alertness. (COR 050). The results of the score were normal. (COR 050). The nurse's examination found that Mr. Clark's gait was steady, that his verbal responses were appropriate, that he was able to obey commands and that he could open his eyes spontaneously. (COR 050). The nurse found no indications that Mr. Clark required urgent or emergent intervention a t that time. (COR 051). The nurse instructed Mr. Clark to follow up with a provider on the Staton medical staff if he continued to experience dizziness. (COR 051).

A member of the Staton nursing staff saw Mr. Clark on June 6, 2016. (COR 039). The nurse examined Mr. Clark and confirmed that his vital signs were stable. (COR 039). A nurse practitioner on the Staton medical staff saw Mr. Clark later that same day. (COR 039). Mr. Clark complained to the nurse practitioner that in the May 9, 2016, altercation with other inmates, he had suffered sixteen (16) stab wounds and broken his nose. (COR 039).

The nurse practitioner evaluated Mr. Clark and noted that the report from the emergency room at Jackson Hospital referred to a nose fracture but did not mention any stab wounds. (COR 039). The nurse practitioner's examination observed bruising around both of Mr. Clark's eyes. (COR 039). The wounds on the inmate's back were healed, and the nurse practitioner's examination found no signs for symptoms of infection. (COR 039). Moreover, the examination detected no new deficits in Mr. Clark's physical condition. (Cor 039). The nurse practitioner concluded from his evaluation

that Mr. Clark's nose fracture and stab wound were healing well. (COR 039). To address Mr. Clark's complaints of headaches and photosensitivity, the nurse practitioner provided him with a lay-in profile for one and a half weeks and ibuprofen to take on an as needed basis.  (Cor 039). The nurse practitioner instructed Mr. Clark to utilize the sick call process if his symptoms had not improved in two (2) weeks.  (COR 039).

[. . .]

Based upon my review of Mr. Clark's circumstances, I am confident that he has received an appropriate level of treatment.  Furthermore, I cannot see any reason to conclude that the course of treatment Mr. Clark received was inappropriate in any way or that the conduct of the Staton medical staff fell below the standard of care of that provided by other similarly situated medical professionals.  Given this course of treatment, in my professional medical opinion, the Staton medical staff acted appropriately in all respects.  Again, based upon my review of Mr. Clark's medical records, I can state to a degree of medical certainty that the members of the medical staff at Staton fully satisfied the standard of care owed by them within the State of Alabama.

There is no evidence or objective data of any kind suggesting that Mr. Clark's condition changed, worsened or declined in any way as a result of the care he has received during his incarceration.  Any allegation by Mr. Clark that he currently does not have access to the medical services available to him at Staton is simply untrue.

*Clark v. Daniels, et al.,* 2:16-cv-403-WHA-WC (Doc. 76 at pp. 15–17, 19).  The medical records submitted in *Clark v. Daniels, id.,* (Docs. 55-2 at pp. 1–61; 55-3 at pp. 1–58) and those submitted in the instant action (Doc. 16-4 at pp. 1–45) further confirm that medical personnel at Staton evaluated Clark each time he appeared at sick call or medical appointments with complaints, assessed his need for treatment, prescribed medications to alleviate the pain associated with his condition when they deemed such necessary, issued medical profiles as warranted, and provided treatment to Clark in accordance with their professional judgment.  Thus, under the circumstances of this case, the court concludes that the course of treatment undertaken by the medical staff at Staton did not violate Clark's constitutional rights.  Specifically, there is no evidence upon which the court could

conclude that any member of the medical staff who provided treatment to Clark acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.

As a result, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference. Clark's self-serving statements of a lack of due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead*, 403 F. App'x 401, 403 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (same). In addition, Clark has failed to present any evidence showing that the manner in which medical personnel addressed his condition created a substantial risk to his health that the attending health care personnel consciously disregarded. The record is therefore devoid of evidence—significantly probative or otherwise—showing that any medical professional acted with deliberate indifference to a serious medical need experienced by Clark.

However, the court recognizes that in the instant action, Clark argues that the defendants, all of whom served in a correctional capacity not a medical capacity, acted in a manner to prevent him access to treatment from professional medical personnel while he incarcerated was incarcerated in the Draper's Disciplinary Dormitory. For the following reasons, the Court concludes that this argument lacks merit. Indeed, it is clear from the

16

medical records that the correctional defendants were not in any way involved in decisions regarding the medical treatment provided to Clark as these decisions are made solely by healthcare professionals employed by Corizon.

For the following reasons the court concludes that Clark has failed to establish deliberate indifference on the part of the correctional defendants. Specifically, Clark has not demonstrated that these defendants were aware of facts establishing "an objectively serious medical need" nor that these defendants disregarded any known serious risk to Clark's health. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference). Consequently, summary judgment is due to be granted in favor of the defendants on Clark's claim alleging deliberate indifference arising from the actions of medical personnel in treating him.

Insofar as Clark seeks to hold the correctional defendants liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover,

17

"supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that the correctional defendants exerted some control over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability]. . . . A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the discharge of his official duties. Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh,* 268 F.3d at 1035 (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding

that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S. Ct. 1949. Thus, liability for actions of the correctional defendants could attach to the other named defendants only if these defendants "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that the correctional defendants did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Clark. The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the treatment provided to Clark and provided treatment to him in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, the correctional defendants can be held liable for decisions of medical personnel only if they undertook actions which bear a causal relationship to the purported violation of Clark's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Clark must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to

act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Clark has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the correctional defendants directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action.  In addition, Clark has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which these defendants failed to take corrective action; instead, the undisputed medical records indicate that Clark had continuous access to medical personnel and received treatment for his injuries and pain.  The undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the correctional defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990); *Turner v. Safely*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987).

For the foregoing reasons, summary judgment is likewise due to be granted in favor of the correctional defendants with respect to liability based on the theory of respondeat superior.  Furthermore, even had Clark presented a proper basis for the claims lodged against the correctional defendants, the evidentiary materials before the court, including Clark's medical records, demonstrate that health care personnel did not act with deliberate indifference to his medical needs.

D.    **CLAIMS    ARISING    FROM    PLAINTIFF'S    DISCIPLINARY PROCEEDINGS.**

### 1.  Cruel and Inhumane Treatment-Due Process

The plaintiff claims that the defendants engaged in "cruel and inhumane" treatment against him when disciplinary action was taken against him for fighting without a weapon. (Doc. 1 at pp. 2–3).[3]  Specifically, he complains that he was locked in a "Restrictive Housing Unit" and sent to disciplinary court where Defendant Coach found him guilty and Defendant Hood approved it.  The undisputed evidence shows that following a disciplinary proceeding where he was found guilty for fighting without a weapon, the plaintiff was housed in Draper Disciplinary Dormitory for 30 days from May 18, 2016 until June 16, 2016.  (Docs. 11-1; 11-4 at pp. 1–11).  He claims that during his time in the disciplinary dorm, he suffered "significant hardship of cruel and unusual punishment and a denial of due process right" because he was forced to sign up for the "Farm-work squad 5 days a week" which necessitated that he give up the Draper prepared lunch and he was "forced to eat a sack lunch, only one cheese sandwich and two peanut butter sandwiches, with no other option for lunch."  (Doc. 25 at pp. 9-10).

The Supreme Court has counseled that due process is implicated only when the actions taken against an inmate represent a "dramatic departure" from the ordinary conditions of incarceration.  *Sandin v. Conner,* 515 U.S. 472, 485 (1995).  Indeed, the plaintiff's claims concerning his treatment in disciplinary do not "present the type of

_____

[3] To the extent that this claim can be read to encompass a claim for deliberate indifference to the plaintiff's health due to the lack of medical care afforded him while in disciplinary, this claim is addressed, *supra,* at pp. 13-20.

atypical, significant deprivation in which a state might conceivably create a liberty interest." *Id.* at 486.  Even so, the undisputed evidence demonstrates that the plaintiff was given advance notice of the charges against him, a hearing on May 27, 2016, where he had the opportunity to present evidence and question witnesses and a written statement of the reasons for the disciplinary.  (Doc. 11-4 at pp. 1–11).  Accordingly, the court concludes that the defendants afforded the plaintiff all procedural due process protections required under the law.  *See O'Bryant v. Finch,* 637 F. 3d 1207, 1213 (11th Cir. 2011) citing *Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974).

## 2.  Conspiracy

The plaintiff claims that the disciplinary charges against him were unfounded and that the defendants conspired to find him guilty for fighting without a weapon to "cover up the fact that [he] was assaulted." (Doc. 1 at p. 3).  This claim fails as a matter of law because the Clark has failed to "show that the parties 'reached an understanding' to deny plaintiff his or her rights . . . [and] prove an actionable wrong to support the conspiracy." *Bendiburg v. Dempsey,* 909 F. 2d 463, 468 (11th Cir. 1990).  Indeed, neither the complaint nor Clark's subsequent pleadings identify any agreement or action taken by the defendants to deny Clark his constitutional rights.  Rather, the plaintiff's claim of conspiracy hinges solely upon the finding of guilt against him in a disciplinary proceeding.  *See Phillips v. Mashburn,* 746 F. 2d 782, 785 (11th Cir. 1984) ("Naked assertion" of conspiracy without "supporting operative facts" insufficient to state a claim.)  Thus, the Court concludes that summary judgment is due on this claim.

**IV.    CONCLUSION**

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.    The defendants' motion for summary judgment be GRANTED.

2.    Judgment be GRANTED in favor of the defendants.

3.    This case be DISMISSED with prejudice.

4.    Costs be taxed against the plaintiff.

On or before **August 7, 2020** the parties may file objections to this Recommendation.   A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 24th day of July, 2020

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE